# UNITED STATES DISTRICT COURT
# EATERN DISTRICT OF VIRGINIA
(NORFOLK DIVISION)

| | |
|---|---|
| NICOLE GIBSON, individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiff,<br><br>v.<br><br>JACKSON HEWITT TAX SERVICE INC., JACKSON HEWITT INC., TAX SERVICES OF AMERICA, INC., BAYSIDE CAPITAL, INC., and CORSAIR CAPITAL, LLC,<br><br>　　　　Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

1

Plaintiff Nicole Gibson ("Plaintiff"), individually and on behalf of all others similarly situated, alleges as follows based on personal knowledge as to herself, on the investigation of her counsel, and on information and belief as to all other matters:

## I.    INTRODUCTION

1.    Plaintiff brings this class action against Defendants Jackson Hewitt Tax Service Inc., Jackson Hewitt Inc., and Tax Services of America, Inc. (collectively, "Jackson Hewitt") for violating Section 1 of the Sherman Act, 15 U.S.C. § 1, by incorporating an employee no-hiring and no-solicitation clause in its standard Franchise Agreement. This no-hiring and no-solicitation clause—referred to by the Department of Justice as a "no-poach agreement"—pursuant to which Jackson Hewitt and its franchisees agree not to hire or solicit each other's employees is a naked restraint of competition and a *per se* violation of the antitrust laws.

2.    Jackson Hewitt is the second largest tax preparation service in the United States. It has approximately 6,000 offices, with more than 50 percent operated by franchisees. Each franchise is operated by an entity that is a separate legal entity from Jackson Hewitt.

3.    Plaintiff and the Class are current and former employees of Jackson Hewitt corporate-owned locations and Jackson Hewitt franchise locations. Plaintiff and the Class suffered reduced wages and benefits and diminished employment opportunities as a result of the unlawful contract, combination, or conspiracy alleged herein.

4.    Jackson Hewitt franchisees, at the direction of and with the assistance of Jackson Hewitt itself, have together colluded to suppress the wages and employment opportunities of the tax preparation personnel and managers who work at Jackson Hewitt and Jackson Hewitt franchisee locations throughout the United States.

5.    Specifically, Jackson Hewitt and Jackson Hewitt franchisees have contracted, combined, and/or conspired to not hire or solicit each other's employees. This conspiracy was

2

facilitated through the written pledge a prospective franchisee was required to execute. Upon information and belief, beginning in at least 2003 and continuing through the present, every Jackson Hewitt franchisee agreed to a no-hire and no-solicit clause. All Jackson Hewitt franchise Agreements include a "Covenant Against Recruiting or Hiring Our Employees" clause ("No-Poaching Agreement"), which provides that, during the franchise agreement term and for a period of two years afterwards, a Jackson Hewitt franchisee may not "solicit, recruit, or hire, for a job position entailing tax preparation, tax preparation management supervisory duties, or tax preparation instruction duties" for persons whose duties include(d) "management of or over company-owned or franchised stores, franchisee training, tax preparation software writing or debugging, tax return processing software writing or debugging, electronic filing of tax returns, tax return processing, processing support, tax return preparation, or tax return preparation advice or support."

6.      Pursuant to its franchise agreement, Jackson Hewitt may "immediately terminate this Agreement upon the occurrence of . . .any person bound by such covenants violat[ing] any of the covenants" thus triggering forfeit of the franchisee's initial franchise fee, potential legal costs and expenses, and imposition of other onerous post-termination restrictions.

7.      The No-Poaching Agreement was an illegal contract, combination and/or conspiracy between and among Defendants and Jackson Hewitt Franchisees. Furthermore, this agreement was an unreasonable restraint of trade.

8.      As the Department of Justice ("DOJ") Antitrust Division and Federal Trade Commission's ("FTC") joint *Antitrust Guidance for Human Resource Professionals* (October 2016) states: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are *per se* illegal under the antitrust laws." The DOJ/FTC *Guidance* elaborates:

3

From an antitrust perspective, firms that compete to hire or retain employees are competitors in the employment marketplace, regardless of whether the firms make the same products or compete to provide the same services. It is unlawful for competitors to expressly or implicitly agree not to compete with one another, even if they are motivated by a desire to reduce costs.

9.      The No-Poaching Agreement between and among Jackson Hewitt franchisees has eliminated franchisees' incentives and ability to compete for employees and has restricted employees' mobility. This agreement has harmed employees by lowering the salaries and benefits employees otherwise would have commanded in a competitive marketplace, and has deprived employees of better job growth opportunities.

10.     The No-Poaching Agreement had and has the purpose of restricting competition for labor and had and has the intended and actual effect of fixing and suppressing compensation and restricting employment mobility. The No-Poaching Agreement between and among Jackson Hewitt and Jackson Hewitt franchisees is a naked restraint of trade that is *per se* unlawful under §1 of the Sherman Act, 15 U.S.C. §1. As the orchestrator of the unlawful agreement, Jackson Hewitt bears *per se* liability therefor.

## II.    JURISDICTION AND VENUE

11.     The Court has subject matter jurisdiction pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26), and 28 U.S.C. §§ 1331 and 1337.

12.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, as well as 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to Plaintiffs' claims alleged herein occurred in this District, a substantial portion of the affected interstate trade and commerce was carried out in this District, and Defendants reside in, can be found in, and/or transacts business in this District.

13.     The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) and Section 16 of the Clayton Act, 15 U.S.C. § 26 to award equitable and injunctive relief for violations of

4

Section 1 of the Sherman Act, 15 U.S.C. § 1. The Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337(a) to award damages for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

14.     Defendants are subject to the jurisdiction of this Court by virtue of Defendants' nationwide contacts and other activities, as well as their contacts with the state of Virginia. In particular, each Defendant, among other things: (a) transacted business throughout the United States, including in this District; (b) had substantial contacts throughout the United States, including in this District; and/or (c) was engaged in an illegal conspiracy that was, in part, entered into in this District and was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business in this District.

15.     This Court has further jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action involving common questions of law or fact in which the aggregate amount in controversy exceeds $5,000,000, there are more than one hundred members of the class, and at least one member of the class is a citizen of a state different from that of one of the Defendants.

16.     In particular, Defendant Jackson Hewitt Inc. was incorporated in Virginia, and the Jackson Hewitt business was founded in and began operations in Norfolk, Virginia.

## III.    PARTIES

**Plaintiff**

17.     Plaintiff Nicole Gibson is Pennsylvania resident.  From 2000 to 2016, Plaintiff worked for Jackson Hewitt as a tax preparer. Plaintiff was paid hourly for her work with Jackson Hewitt.   As a result of Defendants' and their co-conspirators' collusive and anticompetitive conduct, Plaintiff was paid artificially suppressed wages and suffered decreased benefits and job mobility.

5

**Defendants**

18.    Defendant Jackson Hewitt Tax Service Inc. is a Delaware corporation with its principal place of business in Jersey City, New Jersey. The only asset of Jackson Hewitt Tax Service Inc. is owning 100% of the equity of Jackson Hewitt Inc.

19.    Defendant Jackson Hewitt Inc. is a Virginia corporation with its principal place of business in Jersey City, New Jersey.  Jackson Hewitt Inc. is a wholly-owned subsidiary of Jackson Hewitt Tax Service Inc.

20.    Defendant Tax Services of America, Inc. is a Texas corporation with its principal pace of business of Jersey City, New Jersey.  Tax Service of America, Inc. is a wholly-owned subsidiary of Defendant Jackson Tax Service Inc. Defendant Jackson Hewitt Tax Services Inc. operates its corporate-owned locations through Defendant Tax Services of America, Inc.

21.    Defendant Bayside Capital, Inc. is a corporation with headquarters located in Miami, Florida. Bayside Capital, Inc. is the credit-oriented affiliate of H.I.G. Capital, a corporation with headquarters also located in Miami, Florida. From in or around August 2011 until in or around May 2018, Bayside Capital, Inc. was the majority owner of Defendant Jackson Hewitt Tax Service Inc. H.I.G. Bayside Capital controlled Jackson Hewitt during the relevant period up until the sale of Jackson Hewitt. H.I.G. Bayside Capital was aware of and authorized the illegal agreements alleged herein.

22.    Defendant Corsair Capital, LLC is a private equity firm with headquarters located in New York City, New York. In or around May 2018, Corsair Capital, LLC acquired Defendant Jackson Hewitt Tax Service Inc. from H.I.G. Bayside Capital. Jackson Hewitt Tax Service Inc. is currently owned by Corsair Capital, LLC. Corsair Capital controlled Jackson Hewitt during the relevant period following its acquisition. Corsair Capital was aware of and authorized the illegal agreements alleged herein.

6

I-1586295.1

**Co-Conspirators**

23.    Various other corporations and persons not named as defendants in this Complaint, including Jackson Hewitt Franchisees, participated as co-conspirators in the violations alleged and performed acts and made statements in furtherance of the violations alleged.

24.    Defendants are jointly and severally liable for the acts of their co-conspirators whether named or not named as defendants in this Complaint.

## IV.    FACTUAL ALLEGATIONS

25.    Founded in 1982 in Norfolk, Virginia, Jackson Hewitt provides tax preparation and assistance services at physical offices, online, and via desktop and mobile applications. It has nearly 6,000 locations in the United States, with approximately 1,900 corporate-owned offices and 3,800 franchise offices. There are both corporate-owned and franchise locations in virtually every state and the District of Columbia.

26.    Beginning in 1986, Jackson Hewitt began selling franchises. By 1992, Jackson Hewitt had become the second largest consumer tax services provider in the United States. It has opened locations in national retail chains including Wal-Mart, Sam's Club, Kmart, and Sears.

27.    Jackson Hewitt Tax Service Inc. underwent an initial public offering (IPO) on the New York Stock Exchange (NYSE) in June 2004, offering 37,500,000 shares at $17.00 per share. Following the IPO, Jackson Hewitt Tax Service Inc. was traded on the NYSE under the stock symbol JTX.

28.    Jackson Hewitt Tax Service Inc. filed for Chapter 11 bankruptcy in May 2011 and ceased being traded on the NYSE. As reported in Jackson Hewitt's 2010 10-K Report, the most

7

recent year in which Jackson Hewitt filed such a report, its total revenues in 2010 were about $213.8 million.

29.    As stated in its 2018 Franchise Disclosure Document, Jackson Hewitt's total revenues for fiscal year 2018 were about $244.5 million.

30.    At the height of the 2018 tax season, Jackson Hewitt's corporate and franchise owned locations employed over 25,000 individuals, including tax professionals, most of whom were seasonal.

31.    At its peak, Jackson Hewitt had over 7,400 company-owned and franchise locations that prepared more than 3.4 million tax returns in a single tax season.

**The Jackson Hewitt System**

32.    Jackson Hewitt franchisees in the United States must execute a standardized franchise agreement.

33.    Pursuant to the franchise agreement, each franchise is operated as an independently owned and managed business by an entity that is a separate legal entity from Jackson Hewitt. Jackson Hewitt licenses to its franchisees the right to use the Jackson Hewitt brand and Jackson Hewitt system in the operation of these independently owned franchises.

34.    Franchise revenue is critical to Jackson Hewitt's business model. The franchise process begins with a non-refundable application fee of $500. If the franchise is approved, Jackson Hewitt receives an initial franchise fee of $25,000 for those opening a standard office. Numerous other fees are paid to Jackson Hewitt by its franchisees, including royalty fees, advertising fees, technology fees, royalties based on gross sales, and others.

35.    Pursuant to the franchise agreement, Jackson Hewitt has the power to terminate the franchisees' right to operate their Jackson Hewitt franchises upon the commitment of breach, which includes failure of the franchisees to comply with the No-Poaching Agreement

8

clause. Jackson Hewitt franchisees, therefore, are obligated to obey the Jackson Hewitt No-Poaching Agreement clause and violate it at their own peril and to their financial detriment.

36.     Jackson Hewitt's No-Poaching Agreement clause gives it and its franchisees power to restrict employee wages, while simultaneously limiting employees' bargaining power to seek increased wages and improved working conditions. Such clauses create restrictions on employee mobility and competition in the labor market.

**Jackson Hewitt Franchisees: Independent Offices Competing with Jackson Hewitt Corporate-Owned Offices and Other Jackson Hewitt Franchisees**

37.     In executing the Jackson Hewitt agreement, a Franchisee specifically acknowledges that it is "an independent contractor and that no principal-agent, partnership, employment, joint venture or fiduciary relation exists between [franchisee] and [Jackson Hewitt]."

38.     Furthermore, a Jackson Hewitt franchisee must make clear to others that it is a separate entity:

> "[Franchisee] must use in a posting at your Locations and on your business cards, check stock, and stationery, and such other or substitute ways as we may specify in the Manual, the name of the legal entity that owns the Franchised Business and the statement that your Franchised Business is independently owned and operated. You must enter into all business bank accounts, purchase orders, leases, utility arrangements and all other contracts and agreements in your entity's legal name. You may not use "Jackson Hewitt Inc." in any arrangements or contracts with third parties, nor may you use any of the Marks in entering into any arrangements or executing any contracts with third parties, except to indicate your trade name and only in conjunction with your legal name."

39.     Franchisees are responsible for day-to-day operations, including employment matters. Each franchisee specifically has:

> "the sole right to control all aspects of your relationships with your employees and prospective employees, including all decisions regarding hiring, firing, training, supervision, discipline, scheduling (including if you use any scheduling modules we provide to you) and compensation (paying wages to and withholding and paying taxes) in respect of your employees."

9

40.     Jackson Hewitt franchise tax preparation services compete with each other and also with Jackson Hewitt corporate-owned tax preparation services. In its Franchise Disclosure Document, Jackson Hewitt tells prospective franchisees that:

> "[t]he market for paid tax return preparation and related financial products and services is highly competitive. Our network competes with tens of thousands of paid tax return preparers and providers and regional and national accounting firms and financial service institutions that prepare tax returns and provide other related financial products and services as part of their businesses. We also face competition from the online and software self-preparer market, including our own separate online do-it-yourself tax preparation and filing service and the Free File Alliance (a consortium of the IRS and online preparation services, of which we are a member) that provide free or low-cost online tax return preparation, and from volunteer organizations that prepare tax returns at no cost for low-income taxpayers."

41.     In executing the franchise agreement, Jackson Hewitt franchisees agree to terms which note "you may face competition from other franchisees, from outlets that we own, or from other channels of distribution or competitive brands that we control."

42.     The No-Poach Agreement is thus a conspiracy between separate economic actors pursuing separate economic interests.

**The Agreement Not to Compete for Employees**

43.     Jackson Hewitt franchisees have agreed not to compete with each other or Jackson Hewitt-corporate owned tax preparation services with respect to employee hiring. This agreement is evidenced by and memorialized in explicit contractual terms contained in franchisees' Jackson Hewitt franchise agreements. Upon information and belief, beginning in at least 2003 and continuing through the present, Jackson Hewitt incorporated a No-Poaching Agreement clause into its standard franchise agreement. Specifically, Jackson Hewitt and its franchisees agreed to the following:

> *17.3. Covenant Against Recruiting or Hiring Our Employees.* During the Term and for a period of two (2) years after the earlier of (1) the effective date of termination for any reason, or (2) expiration of this Agreement, or (3) the date of the sale of the Franchised Business or a majority of its assets, neither you nor any of your Owners may, without our

10

prior written permission, during the below-mentioned employees' employment with us or our Affiliates, as applicable, and for a period of one (1) year after they leave such employment, solicit, recruit, or hire, for a job position entailing tax preparation, tax preparation management or supervisory duties, or tax preparation instruction duties, within the boundaries of any Territory, which you own or owned within the one (1) year prior to such earlier date, any of our or our Affiliates' employees whose duties with us or our Affiliates include(d) management of or over company-owned or franchised stores, franchisee training, tax preparation software writing or debugging, tax return processing software writing or debugging, electronic filing of tax returns, tax return processing, processing support, tax return preparation, or tax return preparation advice or support.

44.     Upon information and belief, every Jackson Hewitt franchisee entering into a standard franchise agreement with Jackson Hewitt from at least 2003, signed an agreement containing a substantially identical No-Poaching Agreement clause. Given that the franchise agreement contains standardized terms, franchisees reasonably knew that other franchisees also agreed to the No-Poaching Agreement clause.

45.     Pursuant to its franchise agreement, Jackson Hewitt may "immediately terminate this Agreement upon the occurrence of . . .(j) any person bound by such covenants violat[ing] any of the covenants" thus triggering forfeit of the franchisee's initial franchise fee, potential legal costs and expenses, and imposition of other onerous post-termination restrictions.

46.     Violations of the No-Poach Agreement thus subject a franchisee to termination of the franchise, forfeiture of the franchise fee, and risk the entire investment in the business.

47.     Jackson Hewitt franchises, like other franchises, are made available on standardized terms. So a franchisee who enters into a Jackson Hewitt franchise agreement knows that the same terms it has agreed to also apply to other franchisees. One of the standard terms in Jackson Hewitt's franchise agreements with all its franchisees is the no-poach provision referred to above.

I-1586295.1

48.     The No-Poaching Agreement among Jackson Hewitt franchisees is short-sighted and ultimately not in the franchisees' independent interest, even though it is in the interest of the conspirators as a whole when acting together.

49.     The No-Poaching Agreement does not serve the interests of ensuring that Jackson Hewitt offer a quality service.

50.     The No-Poaching Agreement does not serve customers because it does not incentivize Jackson Hewitt franchisees or the Jackson Hewitt-corporate owned business to invest in training workers to improve the Jackson Hewitt experience and service. Consumers can gain from competition among employers because a more competitive workforce may create more or better services and products.

51.     By adhering to the No-Poaching Agreement, Jackson Hewitt franchisees artificially restrict their own ability to hire employees in a manner that is inconsistent with their own unilateral economic interests. By acting in concert, however, they also protect themselves from having their own employees poached by other franchises that see additional value in those employees, such as their training, experience, and/or work ethic. This allows Jackson Hewitt and Jackson Hewitt franchisees to retain their best employees without having to pay market wages to these employees or compete in the marketplace relative to working conditions and promotion opportunities.

52.     Most importantly, the No-Poaching Agreement does not serve Jackson Hewitt or Jackson Hewitt franchisee employees because it does not incentivize franchisees to invest in higher wages, benefits, and improved working conditions, *i.e.*, to compete for their labor. It also dis-incentivizes employees to perform their best work as those efforts are not rewarded commensurately. Competition among employers helps actual and potential employees through higher wages, better benefits, or other terms of employment.

I-1586295.1

53.    Jackson Hewitt and Jackson Hewitt franchisees have a shared interest, however, in keeping labor costs low. As noted above, franchisees pay to Jackson Hewitt royalties based on a percentage of gross sales. Cost of labor therefore has a direct impact on franchisee profitability. By agreeing to not compete for labor, they act against their unilateral self-interest, but serve their shared interest.

54.    But for the No-Poaching Agreement, each Jackson Hewitt franchise is its own economic decision-maker with respect to hiring, firing, staffing, promotions, and employee wages. But for the No-Poaching Agreement, each Jackson Hewitt franchise would compete with each other for the best performing employees.

**The Tax-Preparation Employment Market is Chain-Specific**

55.    The skills, training, and work experience obtained at one tax preparation chain is typically chain-specific, meaning it is not equally valued by other tax preparation chains and do not easily transfer to other tax preparation franchises or other industries, making the No-Poach Agreement especially harmful to employees in that industry.

56.    As one of the largest providers of tax preparation services in the United States, Jackson Hewitt and its franchisees require a consistent group of workers trained not only in tax preparation and assistance but also in Jackson Hewitt's various systems.

57.    Tax preparation is a seasonal employment market, requiring Jackson Hewitt and its franchisees recruit and hire a large number of new or returning employees every year.

58.    Jackson Hewitt's 2010 Form 10-K disclosure to the Securities and Exchange Commission ("SEC") acknowledges that the tax preparation employment market "presents a number of operational challenges for us and our franchisees" including maintaining "flexible staffing" to meet its seasonal staffing needs "because the number of employees at our

13

network's offices during the peak of the tax season is exponentially higher than at any other time[.]"

59.    In other words, the need for qualified tax preparation workers during tax season would otherwise create robust competition between Jackson Hewitt, its franchisees, and other companies providing tax preparation services.  This competition would support higher wages, benefits, compensation and other terms of employment.

60.    Instead, Jackson Hewitt conspired with its franchisees and other co-conspirators to restrict employee mobility and competition in the market, with the purpose and effect of reducing and restricting mobility and limiting and reducing wages, benefits, compensation and other terms of employment.

**Jackson Hewitt Training and Brand-Specific Systems**

61.    All Jackson Hewitt employees must complete a 70-hour, entry level tax course, the Jackson Hewitt Basic Tax Preparation Course, or demonstrate equivalent knowledge by passing an internal exam.

62.    Jackson Hewitt and its franchisees also require tax professionals to pass their internal exam every year.

63.    The Jackson Hewitt Basic Tax Preparation Course requires its tax professionals to learn ProFiler, Jackson Hewitt's proprietary interview-based tax preparation software. The knowledge and skills required to use of ProFiler is specific to employment as a tax professional at Jackson Hewitt.

64.    Jackson Hewitt tax professionals must also obtain familiarity with other Jackson Hewitt products and services, including its "selling techniques" for interacting with clients.

65.    Thus, many tax professionals at Jackson Hewitt's corporate-owned and franchise locations are uniquely suited to working at Jackson Hewitt or one of its franchise locations. As

14

a result, employees should generally be highly mobile between and among Jackson Hewitt's corporate-owned and franchise offices.

66.    All tax professionals at Jackson Hewitt and its franchisees must also obtain familiarity with Jackson Hewitt's propriety Operating System.

67.    Jackson Hewitt requires each franchise location to operate in accordance with its "plan and system for preparing, checking and electronically filing income tax returns using our software, accounting methods, merchandising, equipment selection, advertising, promotional techniques, personnel training and quality standards that feature the Marks (the "Operating System"). The Operating System includes the "Operating Standards," "Marks Standards," and "Technology Standards."

68.    In the absence of Defendants' anticompetitive conduct, competition between and among Defendants and co-conspirators for Jackson Hewitt-trained workers in the highly specialized and technical tax preparation services industry, particularly within the Jackson Hewitt system, would be robust and would have increased and enhanced the workers' compensation, benefits, and working conditions.

**Employment with Non-Jackson Hewitt Brands Is Not a Reasonable Substitute for Jackson Hewitt Employees**

69.    As a result of completing Jackson Hewitt tax courses, certifications, and internal exams, and acquiring specialized knowledge as to the Jackson Hewitt proprietary Operating System, including Operating Standards, Marks Standards, and Technology Standards, as well as Jackson Hewitt's proprietary ProFiler tax return preparation software, employment with a non-Jackson Hewitt tax preparation company or business is not a reasonable substitute for the employees of Jackson Hewitt and its franchisees.

I-1586295.1

70.     Because of the No-Poaching Agreement, and because the education, training, and experience within the Jackson-Hewitt's system are unique to Jackson Hewitt and not transferrable to other tax preparation services, Jackson Hewitt Franchisees do not have to compete with Jackson Hewitt-corporate owned tax preparation services or Jackson Hewitt franchisees, and do not have to compete with non-Jackson Hewitt businesses for their employees.

71.     Training, education, and experience within the Jackson Hewitt system are not transferrable to other tax preparation services for a number of reasons. For example, because ProFiler is interview-based, it is designed and intended to be used by tax professionals servicing clients rather than by an individual preparing his/her own tax returns. And, because ProFiler is proprietary, it can be used only by Jackson Hewitt tax professionals. Thus, the knowledge and skills associated with use of ProFiler is specific to employment as a tax professional at Jackson Hewitt. Therefore, an employee of a Jackson Hewitt who is forced to seek employment outside of Jackson Hewitt as a result of the No-Poaching Agreement will likely have to start over when moving to a different tax preparation service.

72.     Jackson Hewitt and its franchisees do not require tax professionals to have obtained degrees or general education levels. Rather, tax professionals must possess familiarity with Jackson Hewitt's products and services and selling techniques and be able to "[p]resent the Company's value proposition to clients concerning various company products and services and use[] prescribed selling techniques."

73.     These Jackson Hewitt tax courses and certifications, as well as familiarity with Jackson Hewitt's products, services, and selling techniques, are the primary qualifications for open tax professional positions at corporate-owned and franchise offices.

I-1586295.1

74.    With limited educational qualifications apart from dozens of hours invested in Jackson Hewitt-courses and familiarity with Jackson Hewitt's products, services, and selling techniques, many tax professionals at Jackson Hewitt's corporate-owned and franchise locations are uniquely suited to working at Jackson Hewitt or one of its franchise locations. Thus, employees should generally be highly mobile between and among Jackson Hewitt's corporate-owned and franchise offices.

75.    A No-Poaching Agreement like the agreement among Jackson Hewitt and Jackson Hewitt franchisees though reduces employees' outside options and lowers their quit rate, thereby increasing the share of net-returns captured by employers. Further, a franchise-wide no-hire agreement increases the specificity of human capital investment, as training that is productive throughout the franchise chain can be used only by a single franchisee pursuant to the agreement.

**The No-Poach Agreement Is an Illegal and Anticompetitive Restraint of Competition and a Per Se Violation of the Antitrust Laws**

76.    The beneficial effects of competition (and beneficial effects on compensation) are not, however, limited to those particular individuals who receive cold calls or who wish to speak to a rival company about an employment opportunity. The effects instead impact all similarly situated employees because of the effect on information flow and on competition for labor.

77.    The principle of free competition applies to the labor market as well as to trade. "In terms of suppressing competition, companies agreeing not to compete for each other's employees is the same as companies agreeing not to compete for each other's customers," says Joseph Harrington, Wharton professor of business economics and public policy, in his description of a no-poaching agreement.

17

78.    According to Peter Cappelli, Wharton management professor and director of Wharton's Center for Human Resources, a no-poaching agreement is unfair to employees and such a pact "benefits the companies at the expense of their employees." Mr. Cappelli notes that the reason such agreements are illegal and violate both antitrust and employment laws is because "[c]ompanies could achieve the same results by making it attractive enough for employees not to leave."

79.    The collusion of employers to refrain from hiring each other's employees restricts employee mobility. This raises employers' power in the market at the expense of employees and diminishes employee bargaining power. This is especially harmful to employees of Jackson Hewitt, especially those seasonal employees, who may be paid hourly or below a living wage, and the marketable skills they acquire through their work at Jackson Hewitt offices primarily have value only to other Jackson Hewitt offices and do not transfer to other tax preparation services or businesses. In addition, widespread use of no-poach agreements within the franchise industry at large effectively reduces the number of competitive employers in a market to no more than the number of franchise companies. No-poach agreements have anti-competitive impact in labor markets analogous to that of mergers in product markets.

80.    A growing number of commentators have identified proliferating employer no-poaching agreements—including those used within franchise systems—and dubious employee non-compete agreements as significant contributors to the stagnant wage growth.

81.    The United States DOJ has pursued and resolved civil antitrust investigations relating to no-poach agreements made between or among employers. In 2010, DOJ settlements with six high-tech employers prohibited those companies from engaging in anticompetitive no-solicitation agreements relating to their employees on a going-forward basis.

I-1586295.1

82.    The 2016 DOJ/FTC *Antitrust Guidance for Human Resource Professionals* states: "Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal under the antitrust laws."

83.    On November 21, 2017, United States Senators Cory Booker and Elizabeth Warren wrote to Attorney General Jeff Sessions, asking the Attorney General to respond to questions about the DOJ's approach to addressing the anti-competitive effects of proliferating no-poach agreements in the franchise context in particular.

84.    In January 2018 and at several speaking events since that time, DOJ Antitrust Chief and Assistant Attorney General, Makan Delrahim, disclosed that the DOJ Antitrust Division is presently pursuing a number of *criminal* cases relating to employer no-hire agreements. As noted above, the DOJ treats such agreements as *per se* unlawful under §1 of the Sherman Act.

85.    In April 2018, the DOJ announced that it had resolved an investigation into a no-poach agreement among firms in the rail industry, which – like the other matters discussed above – it labeled as *per se* unlawful.

86.    Later in April 2018, the DOJ issued a Division Update indicating that the "Antitrust Division continues to investigate and prosecute 'no-poach' and wage-fixing agreements." The Update made clear that no-hire and no-solicit clauses "[r]obbing employees of labor market competition deprives them of job opportunities, information, and the ability to use competing offers to negotiate better terms of employment." The DOJ reiterated its position on naked no-poach agreements, stating:

> No-poach agreements are naked if they are not reasonably necessary to any separate, legitimate business collaboration between the employers" and that "[n]aked no-poach and wage-fixing agreements are per se unlawful because they eliminate competition in the same irredeemable way as agreements to fix product prices or allocate customers."

19

87.    In July 2018, Attorneys General from ten states and the District of Columbia announced an investigation into no-poaching hiring practices used by large franchise companies:

> [W]e are concerned about the use of No Poach Agreements among franchisees and the harmful impact that such agreements may have on employees in our States and our state economies generally. By limiting potential job opportunities, these agreements may restrict employees' ability to improve their earning potential and the economic security of their families. These provisions also deprive other franchisees of the opportunity to benefit from the skills of workers covered by a No Poach Agreement whom they would otherwise wish to hire. When taken in the aggregate and replicated across our States, the economic consequences of these restrictions may be significant.

88.    To date, Jackson Hewitt has not removed its No-Poach Agreement clause or announced that it will no longer enforce the No-Poach Agreement clause.

## REPRESENTATIVE PLAINTIFF ALLEGATIONS AND ANTITRUST INJURY

### Plaintiff

89.    Plaintiff was employed from 2000 to 2016 at Jackson Hewitt as a tax preparer. She was paid hourly for her work with Jackson Hewitt.

90.    As a result of Defendants' and their co-conspirators' collusive and anticompetitive No-Poaching Agreement, Plaintiff was paid artificially suppressed wages and suffered decreased benefits and job mobility.

### Antitrust Injury

91.    Plaintiff suffered reduced wages, reduced employment benefits, loss of professional growth opportunities, and worsened working conditions because of the express restraint of trade among Jackson Hewitt and Jackson Hewitt franchisees, as orchestrated by Jackson Hewitt itself.

92.    Suppressed wages and employment benefits resulting from their employers' agreement not to compete with each other in the labor market is injury of the type the antitrust

laws were intended to prevent and flows from that which makes the No-Poaching Agreement unlawful.

93.    The potential for broader collusion in franchise chains is enhanced when no-hire and no-solicit agreements are in place. Collusion is promoted when the no-poach agreements can be easily generated and monitored amongst a concentrated group of competitors who all stand to gain profits from the collusion while maintaining similar costs.

94.    The Jackson Hewitt franchisees' No-Poaching Agreement significantly restricts employment opportunities for workers at all Jackson Hewitt offices, including those who have not sought employment with a competitor franchise and those who have not been contacted by a competitor franchise. Such a restriction causes a wider effect upon all Jackson Hewitt employees.

95.    Plaintiff was a victim of the No-Poaching Agreement. By adhering to that agreement, otherwise independently owned and operated competitor businesses suppressed wages and stifled labor market competition for improved employment opportunities.

96.    As a direct, intended, foreseeable, and proximate result of Defendants' unlawful conduct, Plaintiff and members of the Class have been injured in their business and property, in violation of the federal antitrust laws, and have received lower compensation than they would have otherwise.

97.    Absent Defendants' and their co-conspirators' anticompetitive conduct, Plaintiff and Class members would have reaped the benefits of competition.

98.    The injury to Plaintiff and Class members is the type the antitrust laws were designed to prevent and directly flows from Defendants' unlawful anticompetitive conduct.

## CLASS ACTION ALLEGATIONS

99.    Plaintiff bring this action on behalf of herself and on behalf of a nationwide Class pursuant to the Federal Rules of Civil Procedure, Rule 23(a), (b)(2), and (b)(3).

100.    The Class is defined as: All tax professionals and managers who are current or former employees of Jackson Hewitt in the United States, whether employed by a corporate-owned or a Jackson Hewitt franchisee, any time between January 1, 2003 and the present.

The "United States" includes all fifty states, the District of Columbia, and all U.S. territories. "Tax professionals" includes any and all persons who worked at any Jackson Hewitt location during the Class period and whose duties included tax return processing or processing support, tax return preparation or preparation support, tax return preparation advice, operating, writing, or debugging Jackson Hewitt propriety tax return software, or who had to complete Jackson Hewitt Tax Preparation Course(s) or demonstrate equivalent knowledge to qualify for his or her position at Jackson Hewitt. "Managers" includes any and all persons who worked at any Jackson Hewitt location during the Class period and whose duties included supervision or management of tax professionals as defined herein.

101.    Excluded from the Class are Defendants, their affiliates, officers and directors, senior executives and personnel in the human resources and recruiting departments. Plaintiff reserves the right to modify, change, or expand the Class definition on discovery and further investigation.

102.    **Numerosity**: Upon information and belief, the Class is so numerous that joinder of all members is impractical; there are thousands of Jackson Hewitt locations in the United States. While the exact number and identities of the individual members of the Class are unknown at this time, such information being in the sole possession of Defendants and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis allege, that thousands of Class members are the subjects of the Class.

I-1586295.1

103.    **Existence and Predominance of Common Questions of Fact and Law**: Common questions of fact and law exist as to all members of the Class. These questions predominate over the questions affecting individual Class members. These common legal and factual questions include, but are not limited to, whether:

(a)    Defendants orchestrated and engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce;

(b)    Defendants violated the Sherman Antitrust Act, 15 U.S.C. §1, *et seq.*;

(c)    Defendants should be required to disclose the existence of such agreements, contracts, combinations, and/or conspiracies;

(d)    Plaintiff and Class members are entitled to damages, restitution, disgorgement, equitable relief, and/or other relief; and

(e)    The amount and nature of such relief to be awarded to Plaintiff and the Class.

104.    **Typicality**: All of Plaintiffs' claims are typical of the claims of the Class inasmuch as Plaintiff was a Jackson Hewitt corporate-owned or Jackson Hewitt Franchisee employee and each member of the Class either was or is a Jackson Hewitt or Jackson Hewitt Franchisee employee subject to the same agreements and rules as Plaintiff. Further, Plaintiff and all the members of the Class sustained the same monetary and economic injuries of being subjected to artificial suppression of compensation, wages, benefits, and growth opportunity, and the remedy sought for each is the same in which Plaintiff seeks relief against Defendants for herself and all Class members.

105.    **Adequacy**: Plaintiff is an adequate representative because her interest does not conflict with the interests of the Class that Plaintiff seeks to represent, Plaintiff has retained counsel competent and highly experienced in complex class action litigation, and Plaintiff and

23

her counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and Plaintiffs' counsel.

106.    **Superiority**: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and members of the Class. The injuries suffered by each individual Class member are relatively small in comparison to the burden and expense of the individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendants' employment records and franchisees' records.

107.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole.

**FRAUDULENT CONCEALMENT**

108.    Plaintiff and Class members had neither actual nor constructive knowledge of the unlawful No-Poach Agreement conspiracy orchestrated by Defendants, nor would any reasonable amount of diligence by Plaintiff or the Class have put them on notice of the conspiracy. Any statute of limitations is therefore tolled by Defendants' intentional concealment of their No-Poaching Agreement. Plaintiff and Class members were deceived regarding

24

Defendants' collusion to suppress wages and employment mobility and could not reasonably discover the Defendants' anticompetitive conduct.

109.    Neither Defendants nor franchisees disclosed the existence of the No-Poaching Agreement conspiracy to Plaintiff or Class members.

110.    Jackson Hewitt's public statements conceal the fact that it orchestrated and engaged in a No-Poaching Agreement conspiracy.

111.    Plaintiff and the Class would thus have no reason to know of the No-Poaching Agreement evidenced by franchisees' contractual undertakings with Defendants. Plaintiff and the Class are not parties to franchisees' contractual franchise agreements with Defendants. Nor are these contracts routinely provided to employees.

112.    Although Defendants provide their Franchise Disclosure Document to state regulators, such documents are made available by Defendants only upon request by legitimate prospective franchisees. Obtaining Defendants' historic Franchise Disclosure Documents and Franchise Agreement is even more difficult.

113.    Defendants' Franchise Disclosure Document and Franchise Agreement are not routinely provided to employees (or prospective employees), whether by Defendants, by Jackson Hewitt Franchisees, by regulators, or by anyone else. Historic Franchise Disclosure Documents and Franchise Agreements would never be available to Jackson Hewitt or Jackson Hewitt franchisee employees or prospective employees.

114.    Because of Defendants' successful deceptions and other concealment efforts described herein, Plaintiff and Class members had no reason to know Defendants had conspired to suppress compensation or employee mobility.

115.    As a result of Defendants' fraudulent concealment of their conspiracy, the running of any statute of limitations has been tolled with respect to the claims that Plaintiff and the Class

members have as a result of the anticompetitive and unlawful conduct alleged herein.

## CLAIM FOR RELIEF

### Violations of §1 of the Sherman Act
### 15 U.S.C. §1, *et seq.*

116.    Plaintiff incorporates by reference and re-alleges each preceding paragraph as though fully set forth herein.

117.    Defendants orchestrated, entered into, and engaged in unlawful contracts, combinations in the form of trust or otherwise, and/or conspiracies in restraint of trade and commerce in violation of §1 of the Sherman Act, 15 U.S.C. §1, *et seq.*

118.    Defendants engaged in predatory and anticompetitive behavior by orchestrating an agreement to restrict competition among Jackson Hewitt and Jackson Hewitt franchisees, which unfairly suppressed employee wages and unreasonably restrained trade.

119.    Defendants' conduct included concerted efforts, actions, and undertakings among the Defendants and franchise owners with the intent, purpose, and effect of: (a) artificially suppressing the compensation of Plaintiff and Class members; (b) eliminating competition among franchise owners for skilled labor; and (c) restraining employees' ability to secure better compensation, advancement, benefits, and working conditions.

120.    Defendants perpetrated the scheme with the specific intent of lowering costs to the benefit of Defendants and franchise owners.

121.    Defendants' conduct in furtherance of the No-Poaching Agreement was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of Defendants' affairs.

122.    Plaintiff and Class members have received lower compensation from Jackson Hewitt and Jackson Hewitt franchisees than they otherwise would have received in the absence

26

I-1586295.1

of Defendants' unlawful conduct and, as a result, have been injured in their property and have suffered damages in an amount according to proof at trial.

123.    Defendants' contracts, combinations, and/or conspiracies are *per se* violations of §1 of the Sherman Act.

124.    In the alternative, Defendants are liable under a "quick look" analysis where an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on employees and labor.

125.    Defendants' contracts, combinations, and/or conspiracies have had a substantial effect on interstate commerce.

126.    As a direct and proximate result of Defendants' contract, combination, and/or conspiracy to restrain trade and commerce, Plaintiff and Class members have suffered injury to their business or property and will continue to suffer economic injury and deprivation of the benefit of free and fair competition.

127.    Plaintiff and the Class members are entitled to treble damages, attorneys' fees, reasonable expenses, costs of suit, and, pursuant to 15 U.S.C. §26, injunctive relief, for the violations of the Sherman Act and the threatened continuing violations alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class respectfully request that the Court:

A.    Determine that the claims alleged herein may be maintained as a Class Action under Rule 23 of the Federal Rules of Civil Procedure, and issue an order certifying the Class as defined above;

B.    Appoint Plaintiff as representative of the Class and her counsel as Class Counsel;

C.    Declare that Defendants' actions as set forth in this Complaint violate the law;

D.    Award Plaintiff and the Class damages in an amount according to proof against Defendants for Defendants' violations of 15 U.S.C. §1, to be trebled in accordance with those laws;

E.    Award all actual, general, special, incidental, statutory, punitive, and consequential damages and restitution to which Plaintiff and the Class members are entitled by law;

F.    Grant a permanent injunction enjoining Defendants from enforcing or adhering to any existing agreement that unreasonably restricts competition as described herein;

G.    Declare Defendants be permanently enjoined and restrained from establishing any similar agreement unreasonably restricting competition for employees except as prescribed by this Court;

H.    Declare Defendants to be financially responsible for the costs and expenses of a Court-approved notice program by mail, broadcast media, and publication designed to give immediate notification to Class members;

I.    Award pre-judgment and post-judgment interest on such monetary relief;

J.    Award reasonable attorneys' fees and costs; and

K.    Grant such further relief that this Court deems appropriate.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a trial by jury on all issues so triable.

28

I-1586295.1

DATED: January 28, 2019

Respectfully submitted,

/s/ _____
Conrad M. Shumadine
VSB #4325
Counsel for Plaintiff
**Willcox & Savage, P.C.**
440 Monticello Avenue, Suite 2200
Norfolk, VA 23510
Tel: (757) 628-5500
Fax: (757) 628-5566
cshumadine@wilsav.com

Tina Wolfson (*pro hac vice* to be filed)
Robert Ahdoot (*pro hac vice* to be filed)
Alex R. Straus (*pro hac vice* to be filed)
**Ahdoot & Wolfson, PC**
10728 Lindbrook Drive
Los Angeles, CA 90024
Tel: (310) 474-9111
Fax: (310) 474-8585
twolfson@ahdootwolfson.com
rahdoot@ahdootwolfson.com
astraus@ahdootwolfson.com

Douglas A. Millen (*pro hac vice* to be filed)
William H. London (*pro hac vice* to be filed)
Brian M. Hogan (*pro hac vice* to be filed)
**Freed Kanner London & Millen LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Tel: (224) 632-4500
Fax: (224) 632-4521
dmillen@fklmlaw.com
wlondon@fklmlaw.com
bhogan@fklmlaw.com

*Counsel for Plaintiff and Proposed Class*